L. H. JARVIS et al., Appellants,

v.

The BOATMEN'S NATIONAL BANK OF ST. LOUIS, a National Banking Association, Respondent.

No. 54788.

Supreme Court of Missouri, Division No. 1.

March 13, 1972.

Motions for Rehearing and to Transfer to Court En Banc Denied April 10, 1972.

John L. Anderson, Anderson, Anderson & Brooking, Hillsboro, for appellants.

Lewis, Rice, Tucker, Allen & Chubb, Robert S. Allen, Charles C. Allen, Jr., St. Louis, for respondent.

BARDGETT, Judge.

This is a suit in equity in which plaintiffs, the residuary and partial income beneficiaries of a testamentary trust, seek to surcharge defendant-respondent Boatmen's National Bank of St. Louis, as trustee, in the amount of $230,067.00 in favor of the trust. Plaintiffs-appellants charge the trustee in three counts. Counts I and II seek the surcharge and differ only in that Count I alleges misconduct and breach of trust and Count II alleges negligence, unskillfulness and lack of proper care and diligence. Count III incorporates Counts I and II and seeks the removal of the Trustee.

At the conclusion of all the evidence, the Court made extensive findings of fact and conclusions of law and entered its decree found in favor of defendant and against plaintiffs on all three counts; dismissed plaintiffs' petition with prejudice, and, on application of defendant, awarded defendant attorneys' fees against the principal of the

Mary B. Eversole trust, as well as a sum for the necessary expenses in the case to be paid out of the said trust. Following an unavailing motion for new trial plaintiffs appeal.

We have jurisdiction because the amount in dispute exceeds $15,000.00, which was the jurisdictional criteria at the time this appeal was taken. Art. V, § 3, Const.Mo. 1945, V.A.M.S.

The event which forms the basis of this suit was the sale by defendant Trustee of the interests in real estate which were held by the Trustee as part of the assets of the testamentary trust of Mary B. Eversole, to one Edward T. Eversole for $19,933.00 on October 24, 1962. Plaintiffs' position, inter alia, is that the price obtained for the property was wholly and grossly inadequate and that the inadequacy was due to misconduct, breach of trust or negligence on the part of the Trustee.

Mary B. Eversole (hereafter Mary) died testate on April 28, 1962, in Potosi, Washington County, Missouri. Her will, which been prepared by one Gordon Jacques and executed by Mary on January 31, 1941, was admitted to probate in Washington County Probate Court.

Clause II of the Will left all Mary's household furniture, autos, clothing, jewelry and articles of personal use to Edward T. Eversole, if he survived her, and, if not, the described property became part of the residue. Edward did survive Mary.

Clause III created a testamentary trust, the corpus of which consisted of all Mary's real and personal property not bequeathed in Clause I. Gordon Jacques was first named executor and trustee. He declined to serve as did another person for reasons not here relevant, and Boatmen's National Bank, also designated in the will, accepted and became the sole executor and trustee.

Paragraph 1 of the terms and conditions of the trust provides:

"I direct the Trustee to convert all real estate coming into his hands as Trus-

tee into cash by sale thereof as soon as a buyer or buyers can be found and upon such terms and conditions as the Trustee may in his judgment deem satisfactory."

Paragraph 2, inter alia, directed the Trustee to invest and reinvest the proceeds of the estate in such stocks, common, and preferred, bonds, notes and securities as he may approve. Paragraph 3 directed the Trustee to hold the trust property for the benefit of the beneficiaries and to apply so much of the net income and principal as was necessary to make designated annual payments to named beneficiaries. Four individuals were named as income beneficiaries, each to receive stated annual sums varying from $100.00 to $300.00. The fifth income beneficiary was the First Presbyterian Church of Potosi, Missouri, and the annual payment was designated to be $300.00 until the death of the last of the individual beneficiaries. The trust terminates on the death of the last individual income beneficiary, and, upon termination, the Trustee is directed to pay in distribution of the corpus to seven named persons sums $1,000.00 or $2,000.00. One of the seven residuary beneficiaries is Nancy Wallace Eversole. After making payment to the seven named persons the entire remainder is to be paid to the First Presbyterian Church of Potosi, Missouri.

Clause VII, after providing that no bond be required of the Trustee, provides:

"No person or Corporation acting as Trustee or Co-Trustee shall at any time be held liable for a mistake of law or fact or of both law and fact, error of judgment nor for any loss coming to said Trust Estate or to any Beneficiary under this will or to any other person except through actual fraud or willful misconduct on the part of the Trustee to be charged."

Shortly after April 28, 1962, the date of Mary's death, Gordon Jacques went to Boatmen's and spoke to Clifford Shandy, an assistant trust officer. Jacques told Shandy of the will and testamentary trust and requested that Boatmen's undertake the exec-

utorship and trusteeship under the will. After some internal conferences at the Bank, Boatmen's agreed to so serve and Shandy was put in charge of the probate administration. Shandy asked Jacques to tell him the name of some person who would be familiar with Mary's family and her affairs and Jacques suggested Judge Edward T. Eversole. Shandy spoke to Edward Eversole about the need for two appraisers in connection with the inventory and appraisement and asked Edward Eversole to suggest names. He suggested George Wallace and Jesse Essmeyer. Shandy arranged to meet with Judge Eversole, Wallace, Jesse Essmeyer and others at Mary's house at 228 E. High Street, Potosi, on May 9, 1962. They met there and undertook to inventory her personal effects and searched for other assets. On July 12, 1962, the inventory and appraisement were filed and approved by John Eversole who was Judge of the Probate Court of Washington County.

The personalty that became part of the trust consisted of cash, stocks, bonds and notes and was inventoried at the "market or appraised value" as of April 28, 1962 at a total of $244,284.77. The real estate interests that became a part of the trust appear in the inventory and appraisement as follows:

## "REAL ESTATE

An undivided ⅚ interest in real property described as follows:

*Parcel*

(1) 'Lots Nos. 1 through 7, Spanish Grant No. 1851, Twp. 37, NR 2 E. Subject to easements and right-of-ways of record, and comprising approximately 380 acres.'

Assessed Value of ⅚ int.—$8,233 —Carried at $1.00 (See Trust Agreement No. 1, dated December 13, 1951, and recorded in Book 102, Page 226 and 227 in County Recorder's Office).

Real property situate in the County of Washington, State of Missouri, described as follows:

(2) 'Lots 8, 9 and 10 in Old Village Mine of Breton—Less 100 front feet on High Street off of Lot 10—by a depth of 106 feet—

And the South Part of Section 11, Twp. 37—NR 2 E. lying South of the Missouri Pacific RR Tracks numbered and known as 228 East High Street, Potosi, Missouri.'

Assessed Value—$4,810—Carried at $1.00.

(3) 'Lots Nos. 28 and 29 of Spanish Grant 430, Twp. 37—NR 2 E. less Railroad right-of-way, and comprising approximately 213.45 acres.'

Assessed Value—$5,000—Carried at $1.00.

An undivided ½ interest in real property described as follows:

*Parcel*

(4) 'South part of Lot 11, Spanish Grant 430, Twp. 37, NR 2 E. and comprising approximately 41.40 acres.'

Assessed Value of ½ int.—$295— Carried at $1.00.

(5) 'East half of West Frac. half of SE ¼—Sec. 27, Twp. 38, NR 2 E., and comprising approximately 17.50 acres.'

Assessed Value of ½ int.—$75— Carried at $1.00.

(6) 'East half SW ¼—Sec. 26, Twp. 38—NR 2 E. and comprising approximately 80 acres.'

Assessed Value of ½ int.—$180— Carried at $1.00.

(7) 'East half of Lots 1 and 2 of the NE ¼ and NW ¼ of SE ¼ of Sec. 2— Twp. 36—NR 2 E. and comprising approximately 127 acres.'

Assessed Value of ½ int.—$160— Carried at $1.00.

(8) 'W half of SE ¼ of Sec. 12—Twp. 36—NR 2 E. and comprising approximately 80 acres.'

Assessed Value of ½ int.—$105—Carried at $1.00.

(9) 'SW ¼ of NE ¼ and NW ¼ of SE ¼ and SE ¼ of NW ¼, Sec. 31—Twp. 37—NR 2 E. and comprising approximately 120 acres.'

Assessed Value of ½ int.—$220—Carried at $1.00.

(10) 'SE ¼ of SE ¼ of Sec. 34—Twp. 37—NR 2 E. and comprising approximately 40 acres.'

Assessed Value of ½ int. $90—Carried at $1.00.

(11) 'South half of SE ¼, Sec. 13—Twp. 37—NR 3 E., and comprising approximately 80 acres.'

Assessed Value of ½ int.—$400—Carried at $1.00.

(12) 'Lots 1 and 2, Block 4, Dunklin & Fissells Addition to Potosi, Missouri.'

Assessed Value of ½ int. $375—Carried at $1.00. (See Trust Agreement No. 2 recorded in Book 102, Page 55 in County Recorder's Office)"

(Parcel figures appearing to the left of the property description are ours and will be used for reference infra.)

The recapitulation in the inventory and appraisement shows no carried value on the real estate and the April 28, 1962 market or appraised value as "undetermined." The "assessed value" shown totals $19,943.00.

In July, 1962, Judge Eversole told Shandy that he would be making an offer to buy all the real property in Mary's estate and certain stock. Shandy testified that there were no discussions concerning value or price at that time nor at any time prior to the filing of the inventory and appraisement on July 12, 1962.

On July 19, 1962, Judge Eversole wrote two letters to Shandy. In one of the letters (Plaintiffs' Ex. 2) he offered to pay $19,943.00 for all interest of the estate in all real estate listed in the inventory. In the other letter (Plaintiffs' Ex. 4) he suggested that in checking the value of the real estate the Bank contact George S. Wallace and Jesse Essmeyer. The letter said that Wallace was "Secretary-Treasurer of the Potosi Telephone Co. and is probably the most substantial, from a financial standpoint, of any Member of the Presbyterian Church, which is the beneficiary of the trust, and is also a member of the Board of Directors of Washington County Commercial Bank." Mr. Jesse Essmeyer was described as one of the most successful farmers in Washington County. The letter stated that both men were fairly familiar with most of the real estate involved in the estate and would give the Bank (Trustee) their opinion of its reasonable value.

Mr. Irvin P. De Mange testified he was employed as a trust officer at Boatmen's. Under date of September 14, 1962, Mr. De Mange wrote to George Wallace and employed Mr. Wallace to appraise the real estate. The letter observed that Mr. Shandy had told Mr. De Mange that Mr. Wallace had been most helpful in determining the values of stocks held by the estate and that Mr. De Mange thought Wallace would be able to place a value on the real estate.

Under date of October 9, 1962, Mr. Wallace wrote to Mr. De Mange at Boatmen's giving his estimate of values of the real estate. The property in which Mary was the full owner consisted of Parcel 2 (228 E. High St.—Home Place) which Wallace valued at $5,000.00 and Parcel 3 (Cole Farm) which he valued at $5,000.00. Parcel No. 1 (Highway 8 property) in which Mary held an undivided ⅚ interest was valued at $7,000.00. The remaining nine parcels (4 through 12) in which Mary held an undivided ½ interest were valued at a total of $2,000.00. The total of the above is $19,000.00.

On October 17, 1962, after receiving the appraisal shown above, Mr. Jack Westaver, who, at that time was the assistant to Mr. De Mange who handled real estate at Boatmen's, was sent to Potosi by Boatmen's and spent the day with George Wallace inspecting the property Wallace had appraised. Mr. Westaver described his activities that day as an inspection and not an appraisal of the properties. His function was to see if there was any indication of anything that would detract from Mr. Wallace's appraisal or which might change the Bank's opinion concerning the property and the possible sale thereof. Under date of October 18, 1962, Westaver gave Mr. Hugh S. Hauck a memorandum concerning his inspection of October 17. Mr. Hauck, at that time was vice-president of Boatmen's in charge of the Trust Department including administration of trusts and probate estates and the real estate involved in them.

The memorandum stated that the residence located at 228 E. High Street (Parcel 2, supra) was an extremely old frame building in extremely poor condition located on ground that had very limited commercial value, although it was located within the Potosi commercial district, due to the large amount of grading that would have to be done to make it usable and because of a lack of local interest in new commercial construction, and the prospect that economic conditions in the area would not improve much.

The Cole farm (Parcel No. 3, supra) was described as being located only a short distance from town and used only for pasture. The farm had been cut into several pieces by railroad tracks and roads. The farm house was in poor condition and had been gutted by vandals. The two barns were in extremely poor condition.

The remaining parcels, in which the trust held only an undivided partial interest, were described as being of minimum quality. The memorandum concluded with the opinion that "there is very little value in this property even though there appears to be considerable acreage involved."

Mr. Hauck testified that, insofar as a written appraisal was concerned, Boatmen's relied on the appraisal of Mr. Wallace. Boatmen's had obtained copies of certain trust deeds pertaining to the property in which the trust owned fractional interests, which were all the properties except Parcel 2, High Street, and Parcel 3, Cole Farm. It was decided at Boatmen's that the only type of conveyance the Trustee would make would be a quitclaim deed as they believed that warranty deeds would subject the trust to unwarranted risks. Following the inspection by Westaver and internal discussions at Boatmen's concerning the terms of the trust that required the Trustee to sell the real property as soon as a buyer could be found, Boatmen's believed the offer made by Judge Eversole to be a fair one and on October 24, 1962 conveyed all the trust's interest in all the real estate by quitclaim deed to Edward T. Eversole for $19,933.00.

The properties were not advertised for sale; no further appraisals were secured; no outside real estate brokers were consulted; the properties were not offered to other beneficiaries nor to other fractional owners other than Judge Eversole. The Trustee did not bargain or haggle with Eversole in an attempt to get a higher price. No abstracts or surveys were available and none were obtained, because, in the opinion of Boatmen's, it would take too long to obtain them considering the particular trust direction to sell promptly, and because the Trustee did not believe that abstracts and surveys would necessarily produce a higher price. Although George Wallace signed the inventory and appraisement filed in Probate Court and stated that he was not interested in, nor of kin to, any person interested in the estate of Mary Eversole as an heir or devisee, he was in fact the brother of Nancy Wallace Eversole, a specific legatee under the residuary clause of the testamentary trust and a brother-in-law of

Judge Edward Eversole. There was no evidence that the Trustee knew of the foregoing relationships and all witnesses testifying on the point for the Trustee denied they knew anything of this relationship until December of 1963 when they accidentally were informed of it in a letter from an attorney in Potosi concerning other matters.

Two documents entitled "Trust Declaration of Agreement by Trustees" were introduced into evidence. These are the trust deeds mentioned, supra, and referred to by Mr. Hauck in his testimony which pertained to all the real estate in which the trust held a fractional interest. Parcel No. 1, supra, consisting of approximately 380 acres in which the trust held a ⅚ undivided interest was the subject of the trust declaration filed for record with the Washington County Recorder of Deeds on December 13, 1951. Parcels 4, 5, 6, 7, 8, 9, 10, 11, and 12, in each of which the trust held an undivided ½ interest, were the subject of the declaration of trust filed for record in the same office on December 30, 1952.

According to both Declarations of Trust the remaining ownership interests were divided among twenty-six additional owners in varying fractional amounts. Edward and John Eversole were two of the undivided fractional owners. Both declarations named Mary, John and Edward Eversole as trustees and declared them to have the power to sell the full and complete title to any and all of the properties described therein, together with the power to survey, to subdivide, to lease or grant easements on the properties and any other incidentals they deem proper and expedient. This power did not require the consent of the remaining twenty-four owners and upon the death of a trustee the stated powers survived to the remaining trustees. Each fractional owner had the power to sell his fractional share, however this right did not diminish or cut short the power of the trustees to sell the entire property or exercise any of the other powers mentioned.

■ The foregoing is not to be construed as a definitive declaration of rights flowing from these two declarations of trust, but, since Boatmen's was confronted with a rather strong direction to sell the real estate interests as soon as a buyer could be found, it was entitled to consider the provisions in these declarations as they bore on the question of the fair value of the real estate interests it held in trust and ultimately on the question of whether Edward Eversole's offer to buy was fair under the circumstances.

The evidence was conflicting on the 1962 market value of the real estate interests held in trust. The trial court initially held some of plaintiffs' value evidence to be inadmissible and received that evidence under the provisions of S.Ct. Rule 73.01(a), V.A.M.R. In the trial court's findings of fact it declared that the court was considering all of the evidence, including the evidence of plaintiffs' witnesses received under the said rule.

Plaintiffs' evidence pertaining to the value of Parcel No. 2, supra, at 228 E. High Street (sometimes referred to as the Home Place) ranged from $8,000.00 to $26,750.00. Defendant's evidence ranged from $5,000.00 to $8,600.00. R. W. Robinson, a Potosi real estate broker, testified that he was asked to appraise this parcel in 1964. He appraised it as of 1964 at $8,600.00. As of the time of the Robinson appraisal, the house, which was of doubtful or negative value, had been torn down. Robinson listed the property at $14,500.00 and held it for sale in 1965 but received no acceptable offers during a six-month period. He listed it again later, and, after trying to sell it for two years, finally sold the property in October, 1968 for $12,500.00, and received a commission out of the proceeds. The purchasers were two businessmen in Potosi, one of whom was a funeral home owner and the other an insurance man who had formerly had an office in a shopping center that had recently been destroyed by a tornado. The trial court found that in October, 1962 Parcel No. 2, 228 E. High

Street, had a value of no more than $8,-600.00.

As to Parcel No. 3, the Cole Farm, which was the only other property in which the trust was the full owner, plaintiffs' value evidence ranged from $20,000.00 to $27,-600.00. Defendant's value evidence ranged from $5,000.00 to $10,050.00. In 1963 Jesse Essmeyer purchased this parcel together with Parcels 4, 5, and 6 for a total of $8,500.00 from Judge Eversole. Jesse Essmeyer had rented the Cole farm from Mary for twenty-one years prior to her death. Prior to the purchase of the Cole farm Jesse Essmeyer owned all of the land adjoining it. Jesse testified that he told Judge Eversole he would like to buy the Cole farm. Eversole was agreeable to selling but told Jesse that he would have to also buy the other three tracts (Parcels 4, 5, and 6) along with it. Judge Eversole told Jesse he would sell the Cole farm and the other three tracts for a total of $8,-500.00, which offer Jesse accepted. Parcels 4, 5, and 6 were three of the nine tracts in which the Trustee had held an undivided ½ interest, and which were subject to the declaration of trust filed December 30, 1952. The trial court found that this property, the Cole farm, had a value in October, 1962 of no more than $7,260.00. The court further found that there was no evidence that the sales of the Cole farm and Parcels 4, 5, and 6 and the High Street property were anything other than arm's length transactions.

Parcel No. 1 (Highway 8 property) consisted of approximately 380 acres in which the trust held a ⅚ undivided interest. In the main the value evidence as to this was given as a specified dollar value per acre with the per acre value varying depending on whether the acreage fronted on the highway or not. Plaintiffs' evidence of total value of this acreage in fee ranged from $54,850.00 to $145,000.00. Defendant's evidence ranged from $7,000.00 to $13,480.00. There was no evidence as to what a ⅚ undivided interest was worth in 1962 or at any other time.

The trial court found that Parcel No. 1 (Highway 8 property) had a value in fee of no more than $13,480.00 in 1962.

The scope of review in this court-tried case is set forth in S.Ct. Rule 73.01(d), V.A.M.R., and requires this court to review the case on the law and the evidence but directs that we give due regard to the opportunity of the trial court to judge the credibility of the witness and enjoins against setting aside the judgment unless clearly erroneous.

■ The presumption is that a trustee has acted in good faith and the burden is on the one questioning his actions and seeking to establish a breach of trust to prove the contrary. First National Bank of Kansas City v. Hyde, Mo., 363 S.W.2d 647, 655.

■ Boatmen's was not required to accept the position of Trustee and in deciding whether or not to accept the position it had the right to consider the trust instrument as a whole. Once Boatmen's accepted the trusteeship it was, of course, obliged to exercise such skill and care as a man of ordinary prudence would exercise in selling his own property. First National Bank of Kansas City v. Hyde, supra; Restatement of Trusts 2nd, § 174, p. 379; Scott on Trusts, § 174, p. 1408. While this general rule would continue to apply, the trust instrument must be looked to for guidance with respect to particular acts performed by the Trustee.

In this case the Trustee was not authorized to decide whether or not to sell the real estate interests. The Trustee was directed to convert all real estate into cash. Nor was the Trustee authorized to exercise unlimited discretion as to when the property was to be sold. It was ordered to sell the real estate "as soon as a buyer or buyers can be found." The Trustee was authorized to make such sale on such terms and conditions as it deemed satisfactory.

The trust direction to sell the real estate as soon as a buyer can be found modifies what one would expect to be the attitude

of a person offering his own property for sale under ordinary circumstances and places the priority on the prompt sale of the property so as to obtain cash, rather than the priority being placed on obtaining as high a price as possible through ordinary or usual property sale procedure.

The direction to sell as soon as a buyer can be found so as to convert the realty to cash is consistent with the attitude of Mary, expressed in the trust, directing the Trustee to invest in common and preferred stocks, bonds, notes and securities but making no provision allowing the Trustee to buy real property. She undoubtedly believed that the corpus would be benefited—increased—by the prompt conversion of this realty into cash and investment of the cash and was willing for the Trustee to take less than full value for the real estate interest in order to obtain the cash and invest it quickly.

It further appears that Mary knew precisely what she was directing her Trustee to do and appreciated the risk involved because the trust also contains a rather broad exculpatory clause set out, supra.

In Thompson v. Hays, 11 F.2d 244 (8th Cir.), an exculpatory clause which provided that the Trustee not "be held liable for error of judgment or mistake of law or fact, but only for willful default" was given effect. The court there said, 1. c. 248:

"Appellees Hays and Wright had the right to insist upon a limitation of their liability under the law ordinarily applicable to trusteeships if they were to accept the position. They seem to have carefully guarded and restricted liability. Appellant assented to this, and the limit of their liability is fixed by this instrument, which clearly provides that the members of the protective committee are not to be held liable for error of judgment or mistake of law or fact, but only *for willful default.* Therefore the rules of law applicable to the ordinary trusteeship are not entirely applicable here. * * * It is doubtless true that a trustee may be guilty of such wanton

or willful neglect of his duties, such reckless indifference to and disregard of the interests and rights of the beneficiary, that the law will hold him guilty of a 'willful default.' Henry L. Doherty & Co. v. Rice et al. (C.C.) 186 F. 204; Kessler & Co. et al. v. Ensley Co. et al. (C.C.) 129 F. 397."

■ This view is in accordance with I Restatement of Trusts 2nd, § 222, p. 516, cited by plaintiffs. New York cases holding exculpatory clauses invalid are not persuasive as they are based upon a specific New York statute rendering such clauses invalid. Missouri has no such statute, and we hold that this exculpatory clause is valid and not contrary to public policy.

■ Although defendant here had nothing to do with the drawing of the will and trust nor the insertion of the exculpatory clause in it, the Trustee was entitled to consider this clause in connection with the duties imposed by the trust at the time Boatmen's was requested to accept the trusteeship.

Plaintiffs do not charge defendant with fraud nor is there any contention that the Trustee benefited in any way from the sale of the real estate interests.

■ The trial court found that the price obtained for the property was not grossly inadequate, and that the sale was fair and reasonable under all the circumstances. The question here is whether this finding was clearly erroneous. As indicated supra, the evidence as to value covered a wide range. Plaintiffs' evidence as to Parcel No. 2—High Street property—ranged from $8,000.00 to $26,750.00, however this property was actually sold in October, 1968 for $12,500.00 and the trial court gave particular weight to this fact. All witnesses agreed that property values had risen since 1962 and there was evidence that values had more than doubled. The trial court's finding that this parcel had a value in 1962 of no more than $8,600.00 was supported by the evidence and not clearly erroneous.

The Cole farm—Parcel No. 3—was valued by plaintiffs' witnesses from $20,000.00 to $27,600.00, again however, this property was resold together with three other parcels in which the trust held a ½ undivided interest in 1963 for a total of $8,500.00. The trial court's finding that the Cole farm had a value in October 1962 of no more than $7,260.00 was supported by the evidence and not clearly erroneous.

The Highway 8 property—Parcel No. 1 —in which the trust held an undivided ⅚ interest and which was subject to one of the declarations of trust noted supra had not been resold. Again the value evidence covered a wide range, the low being $7,-000.00 and the high being $145,000.00. The trial court found that this parcel, in fee, had a value of no more than $13,480.00 in 1962. In so doing it appears that the court believed the testimony of Melvin Means who valued the property in fee at that figure. Mr. Means was one of four practicing realtors in Washington County in 1962, one of only two practicing realtors in 1969. He has been the local representative for United Farm Agency, a national real estate company, since 1960 and the business consists of selling and appraising rural property. He testified to numerous sales of real estate during 1962 and 1963 in Washington County in which he participated and demonstrated substantial knowledge of real estate values in that county.

The trial court had the duty of weighing the evidence and determining the credibility of the witnesses and this often requires the court to believe one witness over another. The trial court's finding that Parcel No. 1 (Highway 8 property) had a value in fee in October, 1962 of no more than $13,480.00 was supported by credible evidence and is not clearly erroneous.

We have set forth the evidence as to the value of Parcels 4 through 12 in which the trust held an undivided ½ interest and which were subject to a declaration of trust supra. The trial court did not make a specific finding as to the value of these par-

cels. The court did however find that an undivided interest in realty is difficult to sell or evaluate and that this is especially true where, as here, the undivided interests were also subject to the declarations of trust noted supra. The court also found that the price obtained for the sale of all the real estate interests was fair and not grossly inadequate. It is inherent in this finding that the allocation of $2,000.00 to Parcels 4 through 12 was fair and not grossly inadequate.

As stated at the outset, the burden of proof was on plaintiffs. There was evidence that the sale of fractional interests in realty was difficult to accomplish and plaintiffs offered no evidence as to the value of a ⅚ or ½ undivided interest when that interest alone is offered for sale.

In the case of In re Gibert's Estate, 176 App.Div. 850, 163 N.Y.S. 974, the Supreme Court, Appellate Division of New York, stated, "It is conceded that it is proper to make a deduction in valuing an undivided fractional interest in real property because of the diminution of value which results from the fact that it is an undivided fractional interest only. This deduction is due in part to cover the expenses incident to a partition action, but is chiefly due to the fact that the owner of such an undivided interest, particularly if, as in the case at bar, it be a minority interest only, cannot control it, but holds it practically at the mercy of the owners of the other interests. For such an interest there is only a limited market, the proof being that experience shows that the purchasers of undivided interests are usually speculators and opera-tors. This restrictive market for such interests lowers their market value." See also 2 Bonbright, Valuation of Property, p. 707; 34 Am.Jur.2d, Federal Taxation, § 8961.

The fractional undivided interests here are not minority interests, but they were subject to the declarations of trust noted supra which, at least arguably, placed the control of the whole property in the trustees named therein, and these factors less-

ened the market value of the fractional interests held by the trust.

The total maximum value the trial court found the properties to be worth in fee in 1962 excluding the ½ undivided interest was $29,340.00. Plaintiffs' evidence as to the value of the unconnected land in which the trust held an undivided ½ interest was general in that the testimony placed a value on "wild land" in Washington County without regard to the particular tracts, their location, or characteristics. The only evidence directly pertaining to the specific tracts was that the trust's ½ undivided interest in them was worth a total of $2,000.00 in 1962. Considering the positive direction in the trust instrument to sell the real estate as soon as a buyer could be found; the diminished value of a fractional interest particularly when subject to the declaration of trust mentioned supra; and the exculpatory clause, we hold that the trial court's finding that fair value was obtained and that the Trustee did not breach his duties to be not clearly erroneous.

■ Plaintiffs strenuously urge that the defendant breached its duties because of the method employed by defendant in selling the real estate interests. This is premised on the facts that defendant did not advertise the property; did not obtain more than one appraisal; did not haggle or bargain with the purchaser to get a higher price; and did not offer the property to other trust beneficiaries and co-tenants.

Plaintiffs obtained a copy of Mary's will in June, 1962 and knew that it required the real property to be sold within a short time. There was no evidence that plaintiffs or any other beneficiaries under the will or trust ever even considered making an offer to buy any of the property. Nor was there any evidence that anyone would have paid more for the property than the price obtained for it.

The trial court found that the Bank, in selling the property, was exercising its judgment pursuant to the direction in the will to sell all the real estate as soon as possible; that defendant did not exceed its reasonable discretion; that defendant acted in good faith at all times and did not breach the trust.

Cases cited by plaintiffs are not controlling. In Feldman v. Feldman, 234 Md. 173, 198 A.2d 257, an executor was empowered to sell property at a public or private sale. The sale of a certain lot was the subject of the case. It had been appraised by two appraisers of the Orphan's Court at $3,500.-00. The executor reported to Orphan's Court he had arranged for the sale of the lot at $2,500.00 to his nephew. The lot was reappraised at $2,000.00, and Orphan's Court approved the sale. Exceptions were filed by one of the beneficiaries and with the exceptions was filed a written offer by another person to buy the lot for $3,500.00. On appeal the lower court's approval of the $2,500.00 sale was set aside, the court saying that " 'slight inadequacy and reasonable expectation of a better price are sometimes sufficient to justify the setting aside of sales where the approval of a court is necessary or where it is invoked.' " (L.C. 259.) The court was critical of the executor's failure to do anything to obtain a better price.

In our case court approval of the sale was not necessary and slight inadequacy would not be grounds for surcharging the Trustee in view of the positive directions to sell promptly and the exculpatory clause present here, neither of which appears in Feldman. Additionally in Feldman there was a positive offer to buy the lot at $3,-500.00 prior to the Orphan's Court approval of the $2,500.00 sale.

Pennsylvania Co. v. Wilmington Trust Co., 40 Del.Ch. 567, 186 A.2d 751, cited by plaintiffs, resolved itself into an action by trust beneficiaries and an individual trustee against the corporate co-trustee seeking to surcharge the corporate co-trustee in the amount of $500,000.00—which sum had been paid out of trust assets in settlement of a suit brought by Pennsylvania Co. against both trustees seeking specific performance of an agreement to sell railroad stock held in trust or for damages for breach of the agreement. The Chancery

Court of Delaware held that the corporate trustee negotiated an agreement for sale of the railroad stock for less than the maximum price obtainable and knowingly persisted in maintaining the agreement even though it knew that it, corporate trustee, had not reasonably explored the possibility of obtaining a higher price from one Heineman. The opinion in that case is even longer than the instant one and we will not undertake an exhaustive digest of it. The significant factor in Wilmington that is not present here is that while the agreement it had entered into with Pennsylvania Co. was still in an executory state and not yet binding on the trust, another potential purchaser (Heineman) offered to pay $12,-000,000.00 for 100% of the shares held, or $133.33 per share. Heineman's offer, if accepted, would have increased the amount per share received by the trust estate by a full one third and the trust company would have been able to dispose of all rather than part of the railroad stock. The corporate co-trustee did not explore Heineman's offer further nor did it inform the individual co-trustee or the beneficiaries of the Heineman offer but proceeded to reach a final and binding contract with the Pennsylvania Co. at the lower figure. Later the trustee refused to sell to Pennsylvania Co. because of another and higher offer but the contract entered into by the trustee was the basis for the suit by Pennsylvania Co. against the trust and the settlement of that case for $500,000.00. It was this $500,000.00 loss to the trust for which the Delaware Court surcharged the corporate trustee.

In the Pennsylvania Co. v. Wilmington case supra the trustees were under no duty to sell the railroad stock promptly and there was no exculpatory clause in the trust instrument, although we seriously doubt that any exculpatory clause would have been allowed to excuse the breach of trust there appearing.

We have carefully reviewed the record and all authorities cited by plaintiffs, and have concluded that the trial court's findings are supported by the evidence and are not clearly erroneous as to Counts I and II.

Count III sought the removal of the trustee on the same grounds that Counts I and II sought damages. The trial court found that there was no basis for removal of defendant as Trustee and, for the reasons given supra, the trial court's finding is not clearly erroneous.

■ Plaintiffs contend that defendant was not entitled to an award of attorney fees and expenses. This contention is premised on plaintiffs' position that defendant's conduct constituted a breach of trust. Plaintiffs do not contend that the amount of fees and expenses awarded was not a reasonable sum.

A trustee who successfully defends a breach of trust claim such as this is entitled to an award of reasonable attorney fees and expenses. First National Bank of Kansas City v. Hyde, supra.

The judgment of the circuit court is affirmed.

All of the Judges concur.