918 F.Supp. 1347 (1996)
Richard W. BRUNER, et al., Plaintiffs,
v.
BOATMEN'S TRUST COMPANY, Defendant.
No. 4:92CV1850 CDP.
United States District Court, E.D. Missouri, Eastern Division.
March 26, 1996.
*1348 *1349 Charles A. Seigel, III, Partner Seigel and Wolff, P.C., St. Louis, MO, for plaintiffs.
Elizabeth C. Carver, Associate David S. Slavkin, Bryan Cave, St. Louis, MO, for Boatmen's Trust Company.
Harold S. Goodman, Gallop and Johnson, St. Louis, MO, David T. Hamilton, Partner, Saale and Bailey, St. Peters, MO, for Allied Construction Equipment Company.

MEMORANDUM OPINION
PERRY, District Judge.
This case comes before the Court for decision following a non-jury trial. Plaintiffs, who are participants in a profit sharing plan, allege that their plan trustee breached ERISA's fiduciary duties by investing a large portion of the plan assets in a single guaranteed investment contract issued by one now-insolvent insurance company. The Court finds that defendant breached its fiduciary duties and will therefore enter judgment for plaintiffs.

Findings of Fact
1. Plaintiffs are participants in the Profit Sharing Plan and Trust (the "Plan") of Allied Construction Equipment Company ("Allied"), a Missouri corporation in the business of selling and leasing equipment to the construction industry. Allied is the Administrator and Named Fiduciary of the Plan. Defendant Boatmen's Trust Company ("Boatmen's") was the plan trustee at the time of the investment at issue here.
2. Under the Plan, Allied makes contributions to the trustee from time to time and participants receive distribution of their vested benefits upon death, retirement, disability or termination.
3. Allied first established the plan in 1968, and for approximately six years its investments were handled by the Associated Equipment Distributors Association ("AEDA"). The AEDA engaged John Hancock Insurance Company to render investment advice for the participating plans' assets. Allied was unhappy with the low rate of return on plan investments achieved by John Hancock and AEDA, and in approximately 1974, Allied moved the assets to a St. *1350 Louis bank with whom it did its banking business, Tower Grove Bank. In 1984, Tower Grove Bank merged with a much larger bank, Commerce Bank, who then became the successor trustee of the Plan. While Commerce Bank managed the funds, the Plan assets were heavily invested in bond funds, and Allied was somewhat dissatisfied with the performance of the plan portfolio. Allied had also become dissatisfied with Commerce's handling of its banking business, and had established a banking relationship with Boatmen's National Bank, then one of the largest banks in St. Louis and a related company of defendant Boatmen's Trust Company. In January 1988, Allied decided to investigate the possibility of appointing Boatmen's as the Plan trustee, believing that it was prudent to have the Plan investments handled by the same institution with whom it did its commercial banking.
4. On January 8, 1988, plaintiffs John Gammon, Tom Held, and Stan Novak met with Stephen Mace and Charles Wetzel of Boatmen's to discuss transferring the Plan assets. Mace's job at Boatmen's was marketing or new business development, and Wetzel was the commercial loan officer with whom Allied had a relationship. This January 8, 1988 meeting lasted for approximately one hour and was the first time that the Allied representatives had discussed the Plan investments with Boatmen's.
At the meeting, Mace recommended to Allied that 75% of the Plan assets be invested in Boatmen's G Fund, and the remaining 25% be invested in the Boatmen's Institutional Liquid Asset Fund. Mace told Allied that the Boatmen's G Fund would have a five year maturity and pay an effective interest rate of 8.5% compounded annually.
Before making this recommendation, Boatmen's inquired generally about the size of the assets and learned that Allied wanted a stable investment that would provide a good return without being subject to frequent market changes. Boatmen's did not obtain any documentation about the fund before the meeting, and at the meeting did not inquire about the specifics of the fund, its history, or about anticipated contributions or payouts. Because no one asked, Boatmen's did not learn that a retirement payment in excess of ten percent of total fund assets would be payable in the next few months. Boatmen's did not obtain any written statement of the clients' investment objectives, nor did it inquire into the principals' investment experience.
Although Boatmen's had internal policies that plans should be given written descriptions of the purchased products and should provide written statements that they understood the risks and restrictions involved in their investments, no such writings were used in this case. Boatmen's did not provide any written description of the G Fund, and did not tell the Allied representatives that the G Fund invested in insurance contracts, but told them simply that it was a Guaranteed Investment Contract fund with a five year maturity and an effective interest rate of approximately 8.5%. Because of the Allied representatives' negative feelings about the performance of their fund when John Hancock was the advisor, the mention of an insurance company would have been a red flag to them. Because no one from Boatmen's mentioned that the G Fund invested in insurance companies, however, the parties did not discuss this issue. The Allied representatives believed that Boatmen's was guaranteeing the investment in the G Fund.
5. In late January of 1988, Allied formally appointed Boatmen's as the successor trustee. Boatmen's assigned Michael Kenneally as the investment manager and James Clement as the administrative officer of the Plan assets.[1] On February 8, 1988, Allied transferred Plan assets in the amount of $322,642.09 to Boatmen's. On March 11, 1988, all *1351 remaining funds at Commerce were transferred, in the amount of $9,131.34.
6. When it received the Plan assets on February 8, 1988, Boatmen's temporarily invested all the funds in the Liquid Asset account, which was simply an interest bearing fund from which money could be withdrawn on demand. The next day, February 9, 1988, Boatmen's invested $249,986.23, approximately 77% of the Plan assets, in the Boatmen's G Fund. The G Fund applied these funds toward the purchase of units in a GIC issued by Executive Life Insurance Company of California ("Executive Life"). The Executive Life GIC was to mature on March 1, 1993 and was to pay an effective annual interest rate of 8.65%. The remaining funds were left in the Liquid Asset money market account.
7. Boatmen's G Fund is a collective investment fund which invests in guaranteed investment contracts ("GICs") issued by various insurance companies. The G Fund accumulates funds from employee benefit plan contributions until a sufficient amount is available for investment, and then purchases a GIC issued by an insurance company. A GIC is an agreement with an insurance company by which the purchaser of the GIC is entitled to the repayment of the purchase price plus a stated amount of interest at the maturity date specified in the GIC. A GIC is not a marketable commodity and cannot be redeemed prior to maturity except in limited circumstances or at substantial penalty as specified in the GIC. The GIC is guaranteed only by the insurance company.
8. Boatmen's first established its G Fund in approximately 1985, and had purchased ten GICs before the one involved here. Boatmen's engaged an outside consulting firm, William M. Mercer-Meidinger, Incorporated, to assist in the purchase of GICs for Boatmen's G Fund, and Boatmen's and Mercer-Meidinger together made the selection of the insurance company for each GIC. Their practice, followed in this case and in the preceding ten, was to send Boatmen's GIC specifications out for bids to interested insurance companies, and then to select the particular insurance company based on a variety of factors, including the rate of return offered by the insurance company, the other terms agreed to, and the "quality" of the insurance company.
9. At the time Boatmen's G Fund purchased the Executive Life GIC, Boatmen's knew that Executive Life invested heavily in below investment grade securities (junk bonds). It also knew that a related company, Executive Life Insurance Company of New York, had been required by the New York Insurance Commissioner to stop adding junk bonds to its portfolio. In fact, in the two prior GIC purchases for Boatmen's G fund in 1987, Mercer-Meidinger and Boatmen's had rejected GIC bids by Executive Life because of "quality considerations" and Executive Life's refusal to agree to a buy-back provision if Executive Life's industry ratings fell At trial the Boatmen's witnesses testified that they did not believe that Executive Life was any riskier than other insurance companies, but that their concern had been that it suffered from bad publicity, because of the negative connotations then attached to junk bonds and because of the New York Insurance Commissioner situation. Both concerns about Executive Life were well known in the industry at the time. None of this, of course, was disclosed to plaintiffs, as plaintiffs were not even told that the GIC invested in an insurance company.
10. At the time of the GIC purchase, Executive Life carried a rating of A+ from A.M. Best, a service that rates insurance companies. Part of the bid specification stated that Boatmen's would only purchase GICs from companies having an A or better rating from Best's, and the ten previous GICs contained language that the insurance company would allow Boatmen's to withdraw its investment at book value if the company's rating fell to B+ or below at any time. Although this was requested for the GIC at issue here, the Executive Life GIC purchased by Boatmen's G Fund on February 9, 1988 did not contain such a clause because Executive Life would not agree to it. Executive Life's refusal had, in the two prior GIC bids, been part of the reason Boatmen's did not award the earlier contracts to Executive Life. On this occasion, however, Boatmen's decided to waive the requirement because it *1352 wanted the higher rate of return offered by Executive Life. Rates of return had dropped dramatically following the stock market crash of October 1987, and Boatmen's was reluctant to offer a GIC with a guaranteed rate below 8%. All of the ten previous GICs purchased by the G Fund had paid rates above 8%. Executive Life's offer of 8.65% was considerably higher than the next previous offer. That had also been true of the prior two GICs on which Executive Life bid, but in those cases Boatmen's had rejected Executive Life's bid even though it was higher than the others.
11. On March 7, 1988, the Plan paid an expected lump sum retirement benefit of $42,243.22. The funds for this payment were necessarily withdrawn from the Liquid Asset fund, since they could not be withdrawn from the G Fund. Consequently, the portion of the Plan assets that was invested in Executive Life increased from 77% to approximately 91% of the original investment within one month of the GIC purchase. Taking into consideration the additional contributions and transfers of Plan assets to Boatmen's and the mandatory distributions to participants of the Plan and fees paid to Boatmen's (all of which went into and came out of the Liquid Asset fund), the percentage of total Plan assets invested in the Executive Life GIC varied between 87% and 91% during the period of March 1988 to April 1991.
12. In April 1991, Executive Life was placed in conservatorship by the State of California, rendering Executive Life incapable of satisfying its obligation under its GICs. At that time the Allied Plan had approximately 91% of its assets in the Executive Life GIC; no other participant in this GIC had invested more than 55% of its pension assets in the GIC. Although Boatmen's knew of Executive Life's severe financial problems in the spring of 1990,[2] it did not inform Allied of the Executive Life financial problems until after the conservatorship was established. That was the first time Allied knew that its Plan assets were invested in an Executive Life GIC. On March 1, 1993, the maturity date of the Executive Life GIC, Executive Life failed to pay Boatmen's the amount of principal or interest due under the GIC and froze any payments under the GIC.
13. In early 1994, all claimants in the Executive Life Conservatorship were offered the opportunity to choose from two options for settling their claims: one option involved a new GIC-type contract and the other involved an immediate cash payment and anticipated additional cash payments in the future, estimated at a total payout of 84% of the claim. Boatmen's elected the second option. Boatmen's received $186,902.56 in partial payment of the claim attributable to plaintiffs. This money was credited to the Liquid Asset account on April 21, 1994. Boatmen's records valued plaintiffs' remaining interest in the GIC as having a market value of $84,436.04, but, of course, the GIC units are not marketable and any actual value will only be determined when the conservatorship ultimately is closed. Whether any additional value will be received is not now known.
14. Plaintiffs' expert testified to the effect that the 8.65% rate of return expected from the GIC was a reasonable rate of return had the Plan Assets been properly diversified. Under the plaintiffs' theory, their total Plan assets placed at Boatmen's, at that rate, would have had a value of $551,078.00 through December 31, 1994, rather than the value it now actually has.

Conclusions of Law
1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). This Court has jurisdiction of this action by virtue of 29 U.S.C. § 1132(e). Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).
2. The Allied Plan is an employee benefit plan under 29 U.S.C. § 1002(3). Plaintiffs are participants in the Plan under 29 U.S.C. § 1002(7). Allied is the plan sponsor, administrator *1353 and named fiduciary of the Plan pursuant to 29 U.S.C. §§ 1002(16), 1102(a). Boatmen's is the trustee of the Plan under 29 U.S.C. § 1103(a) and is a plan fiduciary under 29 U.S.C. § 1002(21). Plaintiffs have brought this action against Boatmen's under 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2) to recover damages arising from Boatmen's alleged breach of fiduciary duties under 29 U.S.C. § 1104.
3. Plaintiffs allege that Boatmen's breached its fiduciary duties under 29 U.S.C. § 1104 by investing the Plan's assets in Executive Life. Specifically, plaintiffs allege that Boatmen's failed to make a prudent investigation prior to purchasing the Executive Life GIC and that Boatmen's failed to properly diversify the investments of the Plan.
4. The Fiduciary duties section of ERISA requires, in pertinent part, that:
(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and 
* * * * * *
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [and]
(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so;
29 U.S.C. § 1104(a)(1).
5. The trustee must determine that an investment chosen for the plan is reasonably designed to further the purposes of the plan, considering, inter alia, the diversity of the plan's overall investment portfolio and the projected return of the portfolio relative to the funding objective of the plan. 29 C.F.R. § 2550.404a-1. The plan trustee must employ "appropriate methods to investigate the merits of the investment and to structure the investment" according to the standards of one in a similar capacity with knowledge of the nature of the investment. Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir.1984), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506. "The test of prudence focuses on the trustees' conduct in investigating, evaluating and making the investment." Whitfield v. Cohen, 682 F.Supp. 188, 194 (S.D.N.Y.1988).
6. Under the duty of diversification, the trustee should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities that depend on the success of one enterprise. See Marshall v. Teamsters Local 282 Pension Trust Fund, 458 F.Supp. 986, 990 (E.D.N.Y. 1978).
7. Whether a trustee of an ERISA plan has acted prudently is determined according to the prudent person standard established in the common law of trusts. Acosta v. Pacific Enterprises, 950 F.2d 611, 618 (9th Cir.1992); Katsaros v. Cody, 744 F.2d at 278. Under the common law of trusts "[t]he presumption is that the trustee has acted in good faith and the burden of proof is on the one questioning his actions and seeking to establish a breach of trust to prove to the contrary." L.H. Jarvis v. Boatmen's Nat'l Bank of St. Louis, 478 S.W.2d 266, 273 (Mo. 1972); Parker v. Pine, 617 S.W.2d 536, 540 (Mo.Ct.App.1981). The prudent person standard requires the fiduciary to:
(a) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions.
Lanka v. O'Higgins, 810 F.Supp. 379, 387 (N.D.N.Y.1992). "[T]he prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed `from the perspective of the time of the [challenged] decision rather than from the vantage point of hindsight.'" Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir.1994), quoting Katsaros, 744 F.2d at 279; see also Jones v. Baskin, Flaherty, Elliot and Mannino, 738 F.Supp. 937, 941 (W.D.Pa.1989), aff'd, 897 F.2d 522 (3d Cir.1990). This court must look at the circumstances *1354 prevailing at the time Boatmen's made its decision and in light of the available alternatives. Roth, 16 F.3d at 918; DeBruyne v. Equitable Life Assur. Soc. of U.S., 720 F.Supp. 1342, 1348 (N.D.Ill.1989), aff'd, 920 F.2d 457 (7th Cir.1990).
8. The Eighth Circuit has held that once an ERISA plaintiff proves a breach of fiduciary duty and a prima facie case of loss to the Plan, the burden of persuasion shifts to the defendant to show that the losses were not caused by the breach of duty. See Roth v. Sawyer-Cleator, 16 F.3d at 917, citing Martin v. Feilen, 965 F.2d 660, 671 (8th cir. 1992), cert. denied, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). Any ambiguities in the determination of loss must be resolved against the trustee. See Roth v. Sawyer-Cleator Lumber Co., 61 F.3d 599, 602 (8th Cir.1995) (second appeal).
9. From the evidence presented here it is clear that Boatmen's breached its fiduciary duties to plaintiffs. First, Boatmen's failed to investigate the objectives and needs of the Plan, and, second, it imprudently invested too large a portion of the Plan assets in the Executive Life GIC. By failing to fully investigate the Plan and its history and expectations, Boatmen's failed to learn of plaintiffs' aversions to insurance companies, and therefore it failed to adequately consider the client's needs. More importantly, its failure to investigate contribution and distribution expectations kept it from anticipating the full extent of the lack of diversification. By not learning that over ten percent of Plan assets would be paid out within two months of the transfer, it caused the actual investment in the Executive Life GIC to be much higher than even its own recommended 75%. In any event, even the 75% investment in the Executive Life GIC does not meet the prudent person standard of diversification for this particular Plan, considering the known risks of Executive Life and the objectives and needs of the Allied Plan.
10. Defendant has argued that investment in a single insurance contract meets ERISA's diversification requirement, relying on the "look through" concept discussed in the legislative history and in certain Department of Labor advisory opinions, which indicate that ERISA plan benefits may be invested wholly in insurance or annuity contracts because, in general, insurance companies' assets are themselves invested in a diversified manner. See Conference Report, H.R. 93-1280, U.S.Code. Cong. & Admin.News 1974, pp. 4639, 5038, 5085; see also Arakelian v. National Western Life Ins. Co., 680 F.Supp. 400, 406 (D.D.C.1987). This argument cannot provide solace to defendant here however, because Executive Life's concentration of its own investments in junk bonds provided notice to Boatmen's that Executive Life did not have the typical diversification of assets of most insurance companies. As Boatmen's and its advisor Mercer-Meidinger fully recognized, it was this concentration in below investment grade securities which gave Executive Life the ability to offer the higher rates that caused Boatmen's to award Executive Life the bid for this GIC. Boatmen's knew that the higher rates were associated with higher risks, but did nothing to protect Allied from this known higher risk by properly diversifying the Plan assets.
11. Here it is clear that Boatmen's breached its fiduciary duty and that the Plan suffered a loss. It is also clear that that loss was caused by the breach, although the Court believes that it is possible that plaintiffs may have incurred some of these losses even if Boatmen's had prudently invested the fund in a diversified manner. That is, in the absence of a breach of fiduciary duty, it is possible that Mr. Mace might have convinced the Allied representatives that their aversion to insurance companies was somewhat irrational, and would have sold them some portion of the GIC, along with some other, more traditional, diversified funds. The Court lacks any evidentiary basis to construct a damage calculation that takes this possibility into account. This problem is not fatal to plaintiffs' damage recovery, however, because under the Eighth Circuit rule stated in Roth v. Sawyer-Cleator and Martin v. Feilen, the burden of production was on defendant to show that the loss was not caused by the proven breach, and ambiguities must be resolved against the defendant. The Court will therefore not attempt to allocate any *1355 portion of a hypothetical properly diversified portfolio to the G Fund, but will, instead, accept plaintiff's argument that plaintiff should recover all of its losses from the G Fund.
12. The appropriate measure of damages in this case is the difference between the actual performance of the Plan investments and the performance that would have resulted had the Plan fund been invested prudently and diversely. See GIW Indust. Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc., 895 F.2d 729, 733, 734 (11th Cir.1990). As set forth above, for damages purposes the Court will assume that a properly diversified plan in this case would not have included any investment in the G Fund. The Court believes that plaintiff's calculations, however, are overstated in one respect.
Plaintiff's damage calculation concluded that the expected 8.65% rate of return was a reasonable rate for the entire fund. This conclusion was based on comparisons with other illiquid funds, and the evidence clearly shows that plaintiffs' fund, in order to meet distributions, needed to have some liquidity. The Court concludes that the 25% allocation to a cash account (the Liquid Asset account) was appropriate to meet these needs, and that a prudent diversification of the plan assets would have included an initial 25% of the assets in a readily liquid account such as the one chosen. The evidence did not show what rate this fund generated, and the Court assumes that, as with most money market accounts, the rate varied from time to time and was considerably lower than the 8.65% promised by the GIC. As there was nothing imprudent about allocating this percentage to the cash account, it is not appropriate to conclude that it would have generated the higher rate of return. The appropriate damage calculation should therefore simply ignore this segment of the assets, as it is irrelevant to both the breach and the damages attributable to the breach, and because whatever rate plaintiff has received from this portion of the Plan assets is appropriate. An appropriate award of damages must, therefore, deal only with the $249,986.23 actually invested in the G Fund, rather than with the entire Plan assets held at Boatmen's.
Thus, for purposes of damages, the Court will apply 8.65% to the $249,986.23 investment compounded annually, and will deduct out the $186,902.56 actually received from the conservatorship in April of 1994,[3] for a total damage award to plaintiffs of $271,283.55.
The above calculation does not take into account the fact that plaintiffs still hold some units in the G Fund, which Boatmen's has valued at $84,436.04. The actual value of this investment will not be known until any final distribution from the conservatorship is made, and Boatmen's argues that damages are not capable of ascertainment until that time. The Court's power to grant "other equitable relief" under 29 U.S.C. § 1132(a)(3) of ERISA, however, provides a solution which allows finality of this judgment and avoids the possibility of plaintiffs' obtaining a windfall should the GIC conservatorship eventually produce additional funds. The Court will, in the exercise of its equitable powers, order plaintiffs to transfer their remaining interest in the G Fund to Boatmen's, since an appropriate market value for that remaining interest cannot now be calculated.
13. The Court is also authorized under ERISA to "allow a reasonable attorney's fee and costs of action" to a successful plaintiff. 29 U.S.C. § 1132(g)(1). The Court's award of an attorney's fee is discretionary, but a "plan beneficiary who succeeds in an action to enforce rights under a plan should recover attorney fees unless `special circumstance' would make such an award inequitable." Lutheran Med. Ctr. v. Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan, 25 F.3d 616, 623 (8th Cir.1994). The party against whom attorney fees are sought has the burden of proving that such "special circumstances" exist and that they overcome the presumption in favor of an award of attorney fees. Id. at 624.
*1356 The circumstances that a court should consider in awarding attorney fees against a defendant are the following: the degree of culpability or bad faith of the defendant; the defendant's ability to pay an award of attorney fees; the deterrent effect that an award of attorney fees would have; whether the party seeking attorney fees sought to benefit all participants and beneficiaries of an ERISA plan; and the relative merits of the parties' positions. Lutheran Med. Ctr., 25 F.3d at 623; Jacobs v. Pickands Mather & Co., 933 F.2d 652, 659 (8th Cir.1991). Applying these factors to the circumstances of this case, the plaintiffs are entitled to an award of their reasonable attorneys' fees and costs of this action.
14. Having reviewed plaintiffs' attorneys' fee application and defendant's objections thereto, the Court finds that plaintiffs' request is reasonable, with the following exceptions. Plaintiffs' counsel states his fees at a rate of $100 per hour and then asks for an enhancement to $150 per hour. The Court assumes that this means that $100 is plaintiffs' counsel's usual and customary hourly rate and the Court will therefore award that rate, finding no basis for enhancement. Second, the application does not provide any detail for the fees charged by Hammonds & Associates, plaintiffs' expert witness, but merely lists a lump sum of $9,207.00. Mr. Hammonds testified to his hourly rate at trial, but there is no breakout of the bill. The Court finds that $5,500.00 is the reasonable value of Mr. Hammond's services in this case, and will reduce the charge accordingly. Therefore the Court will award $32,090.00 in attorneys' fees and $8,827.17 as reasonable expenses in this case.

Conclusion
Plaintiffs have proven that defendant breached its fiduciary duties and that plaintiffs have been damaged in the sum of $271,283.55. As part of the judgment the Court will order plaintiffs to transfer their remaining interest in Boatmen's G Fund to Boatmen's, to avoid any windfall to plaintiffs should this fund eventually have value. Plaintiffs are also entitled to an award of attorneys fees and costs in the amount of $40,917.17.
A separate Judgment is entered in accord with this opinion.
NOTES
[1] Neither Kenneally nor Clements considered themselves responsible for providing any advice or recommendations regarding the Allied account. Although they invited the plaintiffs to lunch several months after the transfer of assets, nothing substantive was discussed at the lunch. Mace testified that his role ended once the new business was obtained. Kenneally testified that once the 75/25 allocation was made by Mace he really had nothing further to do with the account. Clement did not testify at trial, but the evidence showed that his role was purely administrative, and consisted of supervising the sending of periodic account statements.
[2] Executive Life's Best rating fell to A in early 1990, and within a few months Best's had placed Executive Life on its "Watch" List and then had changed its rating to a "contingent" rating, which is a temporary downgrade. The rating did not actually fall to B+ until early 1991, only two to three months before the conservatorship.
[3] The calculation used by the Court deducted this amount from the principal and interest amount compounded up to April 21, 1994, and then continued compounding the 8.65% interest on only the resulting balance after April 21, 1994, through the date of this judgment.