contract. Brief for appellee on cross-appeal at 29. Inasmuch as we have affirmed the court's cancellation of the contract, we need not further address Stitch's cross-appeal.

## V. CONCLUSION

We find that the evidence adduced at trial demonstrates that there was never a meeting of the parties' minds concerning the meaning of the term "feedlot permit" in the real estate sale contract. We affirm the district court's cancellation of the contract.

AFFIRMED.

———————————

IN RE ROLF H. BRENNEMANN TESTAMENTARY TRUST.
KIM ABBOTT, BENEFICIARY, APPELLANT, V.
JOHN E. BRENNEMANN ET AL.,
TRUSTEES, APPELLEES.
___ N.W.2d ___

Filed October 1, 2013.     No. A-12-1029.

1. **Trusts: Equity: Appeal and Error.** Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record.
2. **Attorney Fees: Appeal and Error.** On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion.
3. ____: ____. When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion.

Appeal from the County Court for Grant County: JAMES J. ORR, Judge. Affirmed.

David A. Domina and Jeremy R. Wells, of Domina Law Group, P.C., L.L.O., for appellant.

Neil E. Williams and Nathaniel J. Mustion, of Lane & Williams, P.C., L.L.O., for appellees.

INBODY, Chief Judge, and MOORE, Judge.

INBODY, Chief Judge.

## I. INTRODUCTION

Kim Abbott is a beneficiary of the testamentary trust created by the last will and testament of her grandfather, Rolf H. Brennemann. Abbott sued the trustees of the trust to compel an accounting of trust assets and liabilities. Abbott's complaint was dismissed by the county court, and she has now appealed to this court.

## II. STATEMENT OF FACTS

### 1. BACKGROUND INFORMATION

On August 18, 1976, Rolf passed away, leaving a last will and testament. Under the terms of Rolf's will, 525 shares of the "Rolf H. Brennemann Company" (the company) were to be held in the Rolf H. Brennemann Testamentary Trust; however, since Rolf's wife, Bessie Brennemann, filed for an elective share of Rolf's estate, 325 shares of the company ended up being held by the trust, which shares constituted a 42.42-percent share of the company. The primary asset of the company was an approximately 5,425-acre ranch located in Grant and Cherry Counties, Nebraska.

Pursuant to the terms of Rolf's will, all of the net income of the trust was to be paid to Bessie for the duration of her life. Upon Bessie's death, the net income of the trust was to be distributed in equal shares to Rolf's three children: Edward Brennemann, Mamie Brennemann, and Rolf William Brennemann (Rolf William). Upon the death of Rolf's last surviving child, the corpus of the trust was to be distributed to Rolf's grandchildren. Bessie died in 1998.

Rolf's will appointed Edward, Mamie, and Rolf William as trustees. If any of the originally appointed trustees, i.e., Rolf's children, were unable to serve as trustee, the oldest son of the previously nominated trustee would serve as successor trustee. Edward passed away in 1982, at which time his children became qualified beneficiaries of the trust and his oldest son, John E. Brennemann, became a trustee. Rolf William passed away on June 1, 2002, at which time his children, including Abbott, became qualified beneficiaries of the trust and his

oldest son, Rolf William Brennemann, Jr. (Rolf William Jr.), became a trustee.

In 1986, the trustees filed a petition to vote company stock, alleging that the company owed significant liabilities, had never paid dividends, and was not providing income to the trust. The petition alleged that John had offered to purchase the ranch, which offer was accepted; it was only after John's offer to purchase the ranch had been accepted that Abbott, one of Rolf William's daughters, also made an offer to purchase the ranch. Thereafter, the county court authorized the trustees to vote the company stock for the sale of the ranch to John pursuant to a June 10, 1986, purchase agreement. The court determined that the price paid for the real estate was at or above fair market value and constituted the most advantageous terms for the trustees to secure.

The 1986 purchase agreement set forth that John and his wife agreed to purchase the ranch on an installment payment basis for a total purchase price of $494,021. Payment of the purchase was to be made with $16,000 at the execution of the purchase agreement; $144,000 at closing; and $334,021 to be paid in nine annual payments, with a 10-percent interest rate and a balloon payment of the unpaid principal and interest on July 1, 1996.

In 1996, an agreement was executed, extending the original purchase agreement for 10 additional years, until July 2006. The record indicates that these additional payments were made each year from 1996 to 2006 at an 8-percent interest rate. Records indicate that on July 11, 1996, the beginning loan amount on the extension agreement was approximately $209,420. Bank statements and canceled checks indicate that John paid those annual payments to the bank and to the trust. On July 14, 2006, the bank issued a trustee's deed of reconveyance for the ranch to John and his wife upon John's final payment in accordance with both the purchase agreement and the extension agreement.

## 2. Procedural History

On April 9, 2010, Abbott filed a "Complaint by Beneficiary to Compel Accounting by Testamentary Trustee" against the

current trustees of Rolf's trust, namely John, Mamie, and Rolf William Jr. Abbott's complaint alleged that she had occasionally been paid small sums of money, but had never received any information regarding the trust. The complaint further alleged that in December 2009, she requested an accounting from the trustees and was refused. The complaint sought a full and complete accounting of the trustees' actions and payment of income derived from the administration of the trust, along with costs and attorney fees.

John, Mamie, and Rolf William Jr. filed an answer and cross-petition, denying many of the allegations contained within Abbott's complaint and petitioning the court for a termination of the trust. On July 12, 2010, the trustees filed a report including an 11-page accounting of trustee actions on the trust from January 1, 2002, through April 30, 2010, with updates on actions taken throughout the proceedings filed thereafter. The report indicated that the trust has four active bank accounts; sets forth moneys received in those accounts, including interest and John's payments pursuant to the purchase agreement; and also lists items paid out, including taxes, professional fees for the accountant, beneficiary distributions for each year, and various bank charges. The trustees' report indicated that the trust balance on January 1, 2002, was $10,917.36 and that through April 30, 2010, the trust had received a total of $208,560.47 and paid out $207,811.73, leaving an April 30 balance forward of $748.74.

In July 2010, Abbott filed a motion to amend her complaint, additionally alleging that the trustees had filed an accounting and that the accounting failed to fully account for trust assets. Abbott's amended complaint includes the original allegation that in December 2009, she requested an accounting and the trustees failed and refused to provide one, and additional allegations that the trustees have failed to maintain adequate records and breached their fiduciary duty to administer the trust in good faith. The amended complaint requested that the trustees be required to render a full and complete accounting, to pay Abbott all the income from the trust in the trustees' control, to redress the breaches by personally paying the amount required to restore the value of the trust property, to restore the

principal of the trust, and to pay all attorney fees and costs, and any other appropriate relief.

### 3. Trial Testimony
### and Evidence

Trial was held on the matter, during which Mamie, who was 74 years old, testified that she had been a trustee since the inception of the trust in 1976. Mamie believed that over the course of the life of the trust, the trustees had acted properly in their duties. Mamie testified that the trust paid income to her mother, Bessie, until Bessie died and that that was her only source of income. In the early 1980's, Mamie testified, the family ranch was indebted and should have been sold, which it was pursuant to a court-approved sale in which John purchased the ranch. Many of the payments made from the sale of the ranch were also used to pay the debts of the ranch, which Mamie said "owed so much money then." Mamie indicated that she was certain all the payments required of John had been made but could not recall specifics about disbursement of the money. Mamie testified that the money from those payments was deposited with the Bank of Hyannis and that she had tried to get the corresponding records from the bank, but had been informed the records had been destroyed. Mamie testified that she did not keep any trust documents and did not know which other trustee or trustees did, though she was sure that such documents had been kept. Further, Mamie was aware that the various banks and accountants were all contacted to retrieve past trust documents and none had any of the requested documents archived. Mamie testified that prior to 2002, beneficiaries were always welcome to information regarding the trust but she did not know what her efforts were to inform the beneficiaries and did not recall making any efforts as a trustee. Mamie and the other trustees had annual meetings before the annual ranch payment was due, and all of the decisions made by trustees were unanimous.

Mamie agreed that many of the documents which predated 2002 were unavailable because they had been destroyed. Mamie testified that the trust, since its inception, had been managed by three separate accounting firms and that if she received any

information regarding the trust, she took it directly to the bank or accounting firm in question.

Mamie testified that at the time of Rolf's death, her two brothers rented the land from the company, which rental continued after Rolf's death. However, Mamie explained that over time, the debt that the ranch incurred became unmanageable and she and her brothers determined that it was not feasible to keep the ranch, resulting in the sale of the ranch in 1986. Mamie testified that at that time, the ranch owed the Federal Land Bank of Omaha approximately $19,000 and Alliance Production Credit $100,000. Mamie testified that the Bank of Hyannis was handling the sale under the trust at that time.

Mamie testified that John and his wife sent the promissory note payments on the purchase agreement to the bank, which changed corporate names several times over the course of the trust. The bank disbursed the funds directly, including distributions. Mamie testified that all of the payments for the ranch were made by John and that the payments were extended, not because John was unable to pay but because her mother, Bessie, was still alive at that time and the extension would ensure that Bessie continued to receive income from the trust, which was a 42.42-percent shareholder in the company. Mamie agreed that regardless of who paid off the promissory note, the bank issued a trustee's deed of reconveyance once the extension agreement had been paid off. We note that after trial was held in this matter, Mamie passed away; however, the action was revived in the name of her personal representative, John. According to the will, after the death of Mamie, Rolf's last surviving child, the trust would terminate and the remaining corpus of the trust was to be paid in accordance with the will's directives.

John testified that he had been serving as trustee since his father, Edward, died in 1982. John testified that in 1996, when the original balloon payment on the ranch was due, he and his wife were in a position to make the payment and his banker recommended that they do so. However, after discussing the matter with Mamie, John decided to extend the loan out another 10 years in order to continue to provide a source

of income for Bessie. John testified that in 2002, when Rolf William Jr. became a trustee, he was present during only the winter months because he lived in Alaska during the summer, so most times John and Mamie were left to deal with the trust. When Rolf William Jr. was present, the three would discuss any issues and would make disbursements after John made the ranch payment in July. John and Mamie would also take care of putting the principal into investments and disbursing the interest.

John testified that he and his wife made every single payment on the ranch and that he never defaulted on any of those payments. John testified that he attempted to locate trust documents from prior to 2002, but discovered that the old files had been destroyed. John explained that Edward and Rolf William had entered into a leasing agreement with the company, which agreement was designed to pay off outstanding debts to the Federal Land Bank of Omaha and Alliance Production Credit, but that Rolf William had failed to make several payments. John indicated that had all the rental payments been made, the debt would have been paid and the ranch would not have needed to be sold. John testified that he had received documents regarding the trust from the accountant, but could not locate those documents.

Abbott testified in her own behalf, in addition to her deposition's being received at trial. Abbott testified she filed this action after receiving a letter from the trust accountant indicating that the trust contained $75,000 and suggesting that the trust be terminated. Abbott testified that after receiving the letter, she requested an accounting, but that she believed the information that she received was only a partial accounting. Abbott testified that prior to her filing the lawsuit, the trustees had failed to provide her any information regarding trust assets, liabilities, and disbursements. Abbott testified that she believed that at the time of Mamie's death, the trust would be divided according to the will, which division would include the value of the ranch. Abbott testified that the trustees had breached their duty as trustees due to the absence of any accounting from 1976 through 2002. Abbott testified that the breach was further substantiated by a lack of evidence

that payments were made by John, by evidence that the loan was not called when it was due and instead was refinanced at a lower interest rate, and by evidence that no default interest income had been noted in the trust. Abbott testified that she would not have an objection to the termination of the trust, except that she felt the trust was not handled in accordance with Rolf's intent, which she felt was to continue the trust until the death of his last surviving child and then to "divide it up."

Abbott testified that the only trust information she ever received, prior to the letter from the accountant, was schedule K-1 tax forms which included information such as interest, the beneficiary's share of income, and expenses. Abbott testified that until Rolf William's death, she did not receive any benefit or payment of money from the trust and did not receive any schedule K-1 tax forms, but Abbott admitted that until that time, she was not entitled to any income from the trust. Abbott testified that she reviewed the schedule K-1 tax forms she received from the trust each year and that she had no questions, but thought that she should have received more information. Abbott testified that she was not aware of whether Rolf William, when he served as a trustee, kept a separate file or provided accountings.

Josh Weiss, an audit shareholder hired by Abbott to analyze the accounting filed by the trustees, testified that he held certifications as a public accountant, in financial forensics, and in business valuation. In his analysis, Weiss inspected several documents pertaining to the case, such as the pleadings, purchase agreement, and accountings submitted to the court. Weiss testified that based upon his review of those documents, in 1986 the trust was entitled to $209,578, or $233,011 taking into account the changes in ownership and a discrepancy in the refinance amount. Weiss testified that Mamie's statement that the trust principal was invested in a fund, totaling approximately $35,000, was inaccurate and that instead of the $25,000 indicated on the August 23, 1995, fund statement, as a purchase confirmation, the trust should have held $101,000 in principal at that time based upon his calculations of the trust's share of the downpayment and principal payments that

should have been made. Weiss testified that he was unable to tell if principal amounts were set aside or if distributions were made from the principal or interest, but that based on his calculations, $157,300 in principal funds was unaccounted for. Weiss testified that the interest rate reduction in the extension agreement from 10 percent to 8 percent resulted in the trust's receiving $22,994 less than it would have received.

Weiss further testified that he could not find any evidence of payments made to the trust prior to 1997 and that there was a default term in the promissory note for late payments made with a default interest rate of 16 percent after the fifth day. Weiss testified that some of the payments on the promissory note were made after the annual July 6 due date and thus were late payments. Weiss indicated that the trustees did not collect any of the late payment fees and interest, which amounted to $786,906 from 1987 to 2001, but Weiss testified on cross-examination that he was unfamiliar with any statutes which might allow for a 30- or 60-day window to cure the late payment without entering into default.

Also on cross-examination, Weiss testified that he did not take into account the $16,000 placed into escrow at the bank for the first payment on the purchase agreement and did not take into account any of the debts of the company, such as the $119,000 in debts to Federal Land Bank of Omaha and Alliance Production Credit, or any of the allowance for open account and attorney fees. Weiss also testified that other expenses, such as loans from shareholders to the company, real estate taxes, and tax consequences from the sale of the company, were likewise not taken into account.

Dan Gilg testified that he had been the accountant for the trust since January 1996. Gilg, an attorney, a certified public accountant, and a certified financial planner, testified that it is customary when a file moves from one accounting firm to another that the predecessor would transfer just enough information as would be necessary for the preparation of the next year's tax return. The previous accounting firm for the trust forwarded Gilg, at his firm, a balance sheet in the transition of the trust, and thereafter, a balance sheet, income statement, statement of expenses, and statement of distributions were all

utilized in preparing the income tax returns and schedule K-1 tax forms that were sent out. The January 1, 1996, balance sheet indicates:

|  | Debit | Credit |
|---|---|---|
| Cash in bank | $ 3,558.86 | |
| Note receivable—John Brennemann (42.42 percent of contract) | 108,107.55 | |
| Investment fund | 25,000.00 | |
| Deferred income—John Brennemann contract | | $ 54,699.16 |
| Fund balance—income | | 176.64 |
| Fund balance—principal | | 81,790.61 |
| | $136,666.41 | $136,666.41 |

Gilg testified that each year, a similar balance sheet was created. Gilg testified that the balance sheet and tax documents from prior to 2002 were shredded in the ordinary course of his firm's business. Gilg testified that in 2009, he issued a letter suggesting that the trust be terminated because it was "non-economical." Thereafter, Gilg testified, he received several requests from Abbott and her sister for trust balance sheets and tax information, in response to which he sent Abbott one packet of information and Abbott's sister three packets of information. Gilg explained that at no time did he deny any request for trust information or withhold information.

Regarding Weiss' report, Gilg indicated that the report and calculations failed to take into account that the sale of the company was a taxable transaction and that there was no information in the calculations regarding federal or state income tax. Gilg explained that for every principal payment made, over 50 percent would have been subject to taxation, and that payment of federal and state taxes are corpus items, not income items, and would not be included in the calculation of distributable income, which would, in turn, account for some of the alleged missing principal testified to by Weiss. Gilg opined that Weiss' calculations were incorrect because in Gilg's analysis of the trust documents, it was evident that early on, the trustees were unable to pay the liabilities of the trust, which led to their seeking court permission to sell the ranch. In his review of those court documents, verification was provided

that there were outstanding liabilities, outstanding real estate taxes, an outstanding note payable to a beneficiary, outstanding open accounts, and outstanding federal and state income taxes. Based upon these liabilities, Gilg opined that little or none of the downpayment made by John would have been left to pay into the trust. Thus, Gilg explained that Weiss' calculations were based upon an assumption that all of the principal on the purchase agreement note payments was put into the bank, but that the calculations were incorrect because of the liabilities on the money. Gilg opined that Weiss' approach focused on the remainder beneficiaries, the grandchildren, instead of on the income beneficiary, which Gilg believed was more in line with the intent of Rolf's will.

Furthermore, Gilg disputed Weiss' statements that no payments had been made on the loan agreement and that the trust had no assets and received no funding prior to 2002, because evidence indicated that payments were being made in 1999 and that the bank was acting as the trustee of the deed of trust, collecting payments, and disbursing income to the beneficiaries. Gilg also testified that during that time, there were only five or six beneficiaries, some of whom were trustees, and that had there been any gap in payments, there would have been issues raised by those beneficiaries or the bank, which was the lender and accepted the payments.

Gilg testified that he was involved in the consideration of the extension of the balloon payment and testified that John and his wife were ready and able to pay the amount designated in the 1986 purchase agreement. However, Gilg testified that in light of the primary purpose of the trust, which was to provide an income stream for Bessie, he was concerned that if the amount due were paid off, the trust would be hit with federal and state income taxes, which would reduce the principal. Further, Gilg testified that the rate of interest for certificates of deposit would not have been sufficient to provide income to Bessie, so in order to avoid those problems, the option to extend the purchase contract at a rate that was higher and to defer the income tax consequences was better.

Gilg testified that in his opinion, the beneficiaries did not suffer any monetary losses by reason of the trustees'

administration of the trust. Gilg agreed that even though he did not have the trust administration documents from prior to 1996, it appeared from the 1996 balance sheet and the 1986 land sale documents that there had been no prepayments and no missed payments. Gilg testified that he had "firsthand knowledge" that all of the payments had been made since 1996. Gilg testified that based upon his calculations, since 1995, the trust had maintained the principal balance within approximately $3,000 of the initially funded balance. Gilg testified that, as he indicated in the letter which led to the litigation, there was no purpose or benefit for the trustees and beneficiaries to continue the trust and that it was very likely the expenses incurred in the maintenance of the trust would very soon exceed the trust's income.

### 4. Trial Court's Order

The trial court found that the trustees had provided the beneficiaries, including Abbott, with a schedule K-1 tax form each year showing the beneficiaries their respective share of the income or loss from the trust estate. The trial court found that in December 2009, Abbott requested a formal accounting of the trust, and that in 2010, the trustees provided a full accounting dating back to 2002, but were unable to provide documentation for years prior to that date because the documents had been destroyed.

The trial court set forth that prior to the enactment of the Nebraska Uniform Trust Code, the trustees had a duty to keep Abbott reasonably informed of the trust and its administration and, upon reasonable request, Abbott would have been entitled to an annual statement of trust accounts. The trial court also set forth that pursuant to Neb. Rev. Stat. § 30-3878(c) (Reissue 2008), the trustees were required to provide Abbott with "'at least annually . . . a report of the trust property, liabilities, receipts, and disbursements, including the source and amount of the trustee[s'] compensation, a listing of the trust assets and, if feasible, their respective market values.'"

The trial court found that Abbott's overall position rested upon her contention that the trustees were unable to provide

Decisions of the Nebraska Court of Appeals
IN RE ROLF H. BRENNEMANN TESTAMENTARY TRUST     365
Cite as 21 Neb. App. 353

any documentation from 1976 to 2002. The trial court found that Abbott attempted to improperly switch the burden of proof to the trustees, to prove that they did not breach their duties, and also that she ignored the fact that prior to 2005, the only obligation of the trustees was to keep Abbott reasonably informed absent a reasonable request for more information or documentation. The court found that Abbott had never requested more than the schedule K-1 tax form provided to her, which, in this circumstance, was adequate to keep her reasonably informed of the trust, and that thus, the burden of proof with regard to the alleged breach of duty remained with her.

The court found that although Abbott asserted that she suffered damages because the trustees could not account for $307,942.71 of the principal and interest payments, she could not prove that assertion. The court found that the evidence presented indicated the payments were made, that the evidence did not indicate there were damages for late payments, and that the trustees did not breach their fiduciary duty by waiving the right to collect a late fee within the context of this family trust. The trial court also determined that Abbott's allegation of the trustees' causing unaccounted principal growth was similarly not proved by Abbott. The court denied Abbott's request for attorney and witness fees and also denied the trustees' request to terminate the trust. It is from this order that Abbott has appealed.

## III. ASSIGNMENTS OF ERROR

Abbott assigns that the trial court erred in the following ways: (1) by failing to shift the burden of proof from Abbott to the trustees when Abbott presented evidence that the trustees had not rendered accountings, (2) by dismissing her claims because she failed to establish a burden of proof she did not bear and imposing upon her the burden of proving matters within the exclusive control of the trustees, (3) by finding that the schedule K-1 tax forms were sufficient accountings when none were received into evidence, and (4) by failing to award attorney fees.

## IV. STANDARD OF REVIEW

[1] Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record. *In re Margaret Mastny Revocable Trust*, 281 Neb. 188, 794 N.W.2d 700 (2011).

## V. ANALYSIS

### 1. Burden of Proof

Abbott first argues that the trial court erred by failing to shift the burden of proof to the trustees when she made a prima facie case proving that the trustees had not rendered accountings. Abbott contends that the trustees admitted that "no accounting was made by [them] at any time between the [t]rust's origination in 1976 and 2009." Brief for appellant at 16. Abbott argues that her burden was to establish that she received no accounting.

Before addressing this issue, we first note that Abbott makes numerous assertions in her pleadings, throughout the proceedings, and on appeal that in December 2009, she requested an accounting and was denied such request. Contrary to those assertions, the record indicates that upon receiving the letter suggesting that the trust be terminated, Abbott requested an accounting from the trustees' accountant, Gilg, which accounting was provided to her, through her attorney, in addition to being filed with the court after she filed her complaint. Gilg testified that he did not deny any such request and fully complied by forwarding Abbott's attorney the accounting. Abbott admitted that she received the accounting, but felt that it was insufficient and alleged that it was only a partial accounting. Clearly, as of 2010, Abbott had received the accounting she had requested in December 2009, after receiving Gilg's letter suggesting termination of the trust, and any argument to the contrary is incorrect.

In Nebraska, the issue of the burden of proof in testamentary trust cases has not frequently been addressed, and there is no Nebraska case law directly addressing the issue of the burden of proof for the duty to inform and account to beneficiaries. Cf., *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d

13 (2009) (beneficiary establishes prima facie case of fraud by showing that trustee's transaction benefited trustee at beneficiary's expense; burden of going forward with evidence then shifts to trustee to establish by clear and convincing evidence that transaction was made under power expressly granted in trust and clear intent of settlor and was in beneficiary's best interests); *Schaneman v. Wright*, 238 Neb. 309, 470 N.W.2d 566 (1991) (burden of proof is upon one seeking to establish and enforce trust or prove same by clear and convincing evidence).

In proceedings for construction of testamentary trusts and against a testamentary trustee for misconduct and breach of trust, the Missouri Supreme Court has repeatedly found that the presumption is that a trustee has acted in good faith and that the burden is on the one questioning his actions and seeking to establish a breach of trust to prove the contrary. See, *Jarvis v. Boatmen's National Bank of St. Louis*, 478 S.W.2d 266 (Mo. 1972); *First National Bank of Kansas City v. Hyde*, 363 S.W.2d 647 (Mo. 1962). Several other courts from around the country appear to follow the same suit. See, also, *In re Estate of Damon*, No. 28378, 2011 WL 576588 at *6 (Haw. Ct. App. Feb. 18, 2011) (unpublished disposition listed at 125 Haw. 242, 257 P.3d 1219 (2011)) ("'[t]he person questioning the trustees' action has the burden of producing evidence to overcome the presumption, and . . . upon the production of such evidence, the trustees have the ultimate burden of establishing the regularity and good faith of the questioned action'"), quoting *Estate of James Campbell, Decsd.*, 42 Haw. 586 (1958); *Salem v. Lane Processing Trust*, 72 Ark. App. 340, 37 S.W.3d 664 (2001) (Arkansas law presumes trustee has acted in good faith and places burden of proof upon those who question his or her actions and seek to establish breach of trust); *Gregory v. Moose*, 266 Ark. 926, 590 S.W.2d 665 (Ark. App. 1979).

The Restatement (Third) of Trusts § 83 (2007), regarding the duty to keep records and provide reports, provides that a "trustee has a duty to maintain clear, complete, and accurate books and records regarding the trust property and the administration of the trust, and, at reasonable intervals on request, to

provide beneficiaries with reports or accountings." The comments to that section indicate that "the records of a trust must provide information that will enable the trustee to account for receipts, expenses, and distributions made to beneficiaries. . . ." *Id.*, comment *a.* at 204. The reporter's notes to § 83, comments *a.* and *a(1).*, also provide that the general rule of law applicable to a trustee burdens the trustee with the duty of showing that the account which he or she renders and the expenditures which he or she claims to have made were correct, just, and necessary. "'"He is bound to keep clear and accurate accounts, and if he does not the presumptions are all against him, obscurities and doubts being resolved adversely to him."'" *Id.* at 208, citing *Wood et al. v. Honeyman et al.*, 178 Or. 484, 169 P.2d 131 (1946), citing 4 Bogert on Trusts and Trustees, § 962 (1935). However, the Restatement (Third) of Trusts, § 100, comment *f.* at 68 (2012), specifically sets forth the burden of proof in a suit against a trustee: "When a plaintiff brings suit against a trustee for breach of trust, the plaintiff generally bears the burden of proof."

In its final order, the trial court found:

> In order to prevail on her claim for damages, [Abbott] acknowledges in her written closing argument that she has the burden of proof to show [the trustees] have breached their duties as trustees and the amount of damages caused by the breach. An overall theme to [Abbott's] position is that . . . since [the trustees] are unable to provide documentation from 1976 to 2002, the court must therefore assume that there were breaches of duty causing damages to [Abbott]. To this court, that argument is an attempt to improperly switch the burden of proof upon the [trustees] to prove that they did not breach their duties as trustees. That argument also ignores that, prior to 2005, the trustees['] only obligation was to keep [Abbott] "reasonably informed" absent a reasonable request by [Abbott] for a more thorough statement of the accounts of the trust. . . . The court believes that in this circumstance, the annual K-1 was adequate to keep [Abbott] reasonably informed of the trust in order for [Abbott] to protect her interests. The fact that records

prior to 2002 have been destroyed when [Abbott] never requested them, does not prove a breach of the trustees' duties. The burden, therefore, remains with [Abbott] to prove any alleged breaches of duty.

It is clear from that order that the trial court did not fail to shift the burden of proof, but instead determined that Abbott had not met her initial burden of proof as she alleges and, as such, that the burden never shifted to the trustees. This assignment of error is without merit, but leads us into Abbott's next assignment of error.

## 2. Trust Accounting

Abbott assigns that the trial court erred by dismissing her complaint because she failed to establish her burden of proof. Abbott contends that the trustees did not provide any accountings to the beneficiaries at any time from 1976 through 2009. In order to more efficiently address the merits of this issue, we have broken down the analysis into three relevant time periods: 1976 through June 1, 2002; June 1, 2002, through December 31, 2004; and 2005 through 2009.

### (a) 1976 through June 1, 2002

The first time period during which Abbott contends that no accountings were made is from 1976, when the will came into effect, through Rolf William's death on June 1, 2002.

The first component of Abbott's argument for this timeframe is that the trustees admitted that no accountings were made during this time. John and Mamie admitted that no documents prior to 2002 could be found because they had been destroyed by the banks and accountants managing the trust. Mamie testified that she could not remember what information she had forwarded to the accountant and bank and could not remember whether any information, or what information, was distributed to beneficiaries. From 1976 through 1982, the income beneficiaries, aside from Bessie, were also trustees. In 1982, Edward passed away and John became a trustee. Aside from Abbott, no beneficiary testified or was involved in the proceedings, and thus, the record is devoid of any information regarding what any of the other beneficiaries may or may

not have received during the time at issue. Abbott testified that she did not receive information or distributions from the trust until she became a beneficiary in 2002, when Rolf William died.

Abbott alleged that there had not been a proper accounting for the trust by virtue of the lack of any documentation from 1976 through 2002, at which time the burden shifted to the trustees to show to the contrary. The testimony and evidence presented at trial are clear that the trustees could not produce evidence of recordkeeping for the trust through 2002, aside from some banking statements and documents involving the purchase agreement and extension agreement. The trustees could not provide an adequate accounting of the trust from 1976 through 2002 and, therefore, breached their duty to inform and report.

Neb. Rev. Stat. § 30-3890 (Reissue 2008) provides that the remedy for a trustee's violating a fiduciary duty ranges from compelling the trustee's performance to monetary redress to restoring the trust. See, also, Restatement (Third) of Trusts § 83, comment *a(1)*. at 204 (2007) (trustee who fails in duty to keep proper records "is liable for any loss or expense resulting from that failure").

These possible remedies lead us directly to the central component of Abbott's argument that, beyond the fact that trust information was never supplied to the beneficiaries, there is no evidence that John ever made any payments on the purchase agreement and the extension agreement to the trust. To the contrary, the information and records regarding the trust from that time period consist mainly of information regarding the purchase of the ranch by John. In that regard, Mamie testified that although she did not have any trust documentation dating that far back, the information regarding the trust was available and was forwarded and taken care of by the bank or accountant dealing with the trust. Mamie testified that all of the payments were made by John and that those payments provided the income for Bessie. John testified that he and his wife made all the payments on the purchase agreement and the extension agreement, and bank records indicate that those

payments were made. The original purchase price of the ranch was $494,021. A payment of $16,000 was made by John at the execution of the purchase agreement; $144,000 was paid at closing; and $334,021 was to be paid in nine annual payments, with a 10-percent interest rate and a balloon payment of the unpaid principal and interest on July 1, 1996. The original purchase agreement was extended by the parties in order to continue to provide Bessie with an income source in line with Rolf's intent to provide for her. Evidence received by the trial court indicates that on July 11, 1996, the beginning loan balance on the extension agreement was approximately $209,420. The record indicates that the payments under the extension agreement were made each year from 1996 to 2006, at an 8-percent interest rate. Bank statements and canceled checks indicate that John made those annual payments to the bank and to the trust. On July 14, 2006, the bank issued a trustee's deed of reconveyance for the ranch to John and his wife upon John's final payment in accordance with both the purchase agreement and the extension agreement.

Unfortunately, the underlying issue revealed in these proceedings, as is the case in many family trust cases, is that there is animosity between Abbott and John stemming from the court-approved sale of the ranch to John and the rejection of Abbott's offer to purchase, but as far as these proceedings are concerned, those feelings do not translate into evidence of nonpayment of the annual payments due by John and his wife. Therefore, even though the trustees breached their duty to inform and report during this time period, that breach caused no damage to the trust and is harmless.

### (b) June 1, 2002, through December 31, 2004

The next time period which we address, which is included in Abbott's arguments regarding a lack of accounting by the trustees, is June 1, 2002, through December 31, 2004. As indicated above, on June 1, 2002, Abbott's father, Rolf William, passed away and, by virtue of the trust, Abbott became an income beneficiary.

Testimony elicited at trial indicates that beneficiaries received annual schedule K-1 tax forms which provided the recipient with information such as interest, the beneficiary's share of income, and expenses, which Abbott admitted herself to receiving and reviewing each year after she became a beneficiary in 2002, after Rolf William's death. Abbott testified that prior to becoming a beneficiary in 2002, she had no specific knowledge of the trust outside of its existence, and she explained that Rolf William did not discuss the trust with her and that she herself had not made any request of the trustees for any information regarding the trust prior to 2009. This evidence clearly indicates that trust information was distributed during the timeframe at issue, but it is the sufficiency of that information that Abbott next calls into question.

As the trial court indicated in its order, prior to the enactment of the Nebraska Uniform Trust Code, the trustees, in their duty to inform and account to beneficiaries, were required to keep beneficiaries "reasonably informed" and, upon "reasonable request," were required to provide beneficiaries with "a statement of the accounts of the trust annually." Neb. Rev. Stat. § 30-2814 (Reissue 1995). Pursuant to § 30-2814, from 2002, when Abbott became a beneficiary to the trust after Rolf William's death, through December 31, 2004, Abbott was reasonably informed of the trust, as she received schedule K-1 tax forms annually and made no further request for information regarding the trust. There is also no merit to this portion of Abbott's argument.

### (c) 2005 through 2009

The final time period which Abbott raises is from 2005 through 2009. Clearly, beneficiaries were receiving information regarding the trust through the distribution of schedule K-1 tax forms, so the question then becomes whether or not those schedule K-1 tax forms, sent to the beneficiaries each year in this case, were sufficient to inform pursuant to the Nebraska Uniform Trust Code from January 1, 2005, forward. Section 30-3878(a) provides for the trustees' duty to inform and report, insomuch as the "trustee shall keep the qualified beneficiaries of the trust reasonably informed about the

administration of the trust and of the material facts necessary for them to protect their interests." Section 30-3878(c) further enumerates:

A trustee shall send to the distributees or permissible distributees of trust income or principal, and to other qualified or nonqualified beneficiaries who request it, at least annually and at the termination of the trust, a report of the trust property, liabilities, receipts, and disbursements, including the source and amount of the trustee's compensation, a listing of the trust assets and, if feasible, their respective market values.

Testimony elicited at trial indicates that the schedule K-1 tax form includes information regarding interest, the beneficiary's share of income, and expenses. However, we cannot make any further examination of what information is within the contents of the schedule K-1 tax forms distributed annually, other than the information testified to by Abbott, because none of those tax forms are found in the record before the court. As such, the information in the record regarding the schedule K-1 tax forms does not appear to be sufficient within the confines of § 30-3878, as compared to the more detailed accounting which was filed by the trustees with the court at the inception of this litigation. That accounting provided specific information regarding bank accounts, investment account growth and transactions, deposits, and transfers. The accounting also includes a detailed accounting of various fees, beneficiary and trust distributions, and bank charges. Therefore, based upon the record before the court, we conclude that the schedule K-1 tax forms distributed in 2005 through 2008 did not comply with the trustees' duty to inform and report as required by § 30-3878, and the trustees thereby breached their duty to inform and report by not providing sufficient accountings to the beneficiaries. The trial court erred by determining that there had been no breach of duty by the trustees.

Although we find that the trustees breached their duty to inform and report, based upon the record in this case, we nonetheless find that the trial court did not err by dismissing Abbott's complaint. As discussed above, § 30-3890 provides

the trial court with a list of possible options to remedy a breach of trust, which includes, in subsection (b)(4), to "order a trustee to account." We find no error in the trial court's dismissal, because the trustees' breach was cured once the accounting information was filed with the court. The submitted accounting, as indicated above, reveals all of the trust actions and more fully complies with § 30-3878. Thus, even though the county court erred by finding that there had been no breach of the trustees' duty to inform, that error was harmless, as the breach has been cured.

Furthermore, the record in this case does not support Abbott's assertions that the trustees' breach caused monetary damages to the trust. We agree with the trial court that the record indicates that this trust was not a significant income-producing trust and that although distributions were made to the beneficiaries, those distributions were minimal in comparison to the funds that Abbott alleges existed. The record indicates that tax forms were sent out yearly to the beneficiaries. The original purpose of the trust, which was clearly laid out in Rolf's will, was to provide income for Bessie. The trustees' actions throughout the life of the trust, including the sale of the ranch to a trustee, were court approved and prolonged the benefit to Bessie through the extension of the purchase agreement, the payments under which were all made in accordance with purchase agreements and extensions with the bank and were substantiated through bank statements indicating the payments had been made.

### 3. Attorney Fees

Abbott argues that the trial court erred by denying her request for attorney fees, because the trustees failed to discharge their duties to account for the trust.

[2,3] On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007). When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *Id*. "In a judicial proceeding involving the

administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." Neb. Rev. Stat. § 30-3893 (Reissue 2008).

Having reviewed the record, and based upon the circumstances of this case, we conclude that the trial court did not abuse its discretion by denying Abbott's request for attorney fees and we affirm that determination.

## VI. CONCLUSION

In sum, we find that the trial court did not improperly shift the burden to Abbott, but it found that she had not met her burden to show that the trustees had violated their duty to report and inform. Upon our review of the evidence, we find that Abbott met her burden of proof by alleging that she received no information regarding payments made by John when Mamie admitted to having no documentation prior to 2002. The burden then shifted to the trustees to show, through evidence and testimony, that sufficient information was provided to the trustees and beneficiaries—which they could not. However, the trust did not suffer any losses due to that breach and, thus, was harmless. For the time period of 2002 through 2005, the accounting given to the beneficiaries was sufficient. However, the record indicates that from 2005 until 2009, that information was insufficient to satisfy the statutory requirements and a breach of duty was committed by the trustees, although that breach was thereafter cured. Thus, we find that the trial court did not err by dismissing Abbott's complaint. Furthermore, we also find that the trial court did not abuse its discretion by denying Abbott's request for attorney fees. Therefore, we affirm.

Affirmed.

Riedmann, Judge, participating on briefs.